IN THE UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF GEORGIA

DUBLIN DIVISION

MITCHELL LUDY,                            )
                                          )
                Plaintiff,                )
                                          )
        v.                                )        CV 318-033
                                          )
CONSTANCE PULLINS, Nurse; CERT            )
SGT. JASON HURST; CERT OFC.               )
LAKEISHA SMITH; and CERT OFC.             )
LARRY TIMMONS,                            )
                                          )
                Defendants.[1]            )

_____

## MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION

_____

Plaintiff, an inmate at Central State Prison in Macon, Georgia, is proceeding *pro se* and *in forma pauperis* in this case brought case pursuant to 42 U.S.C. § 1983, concerning events alleged to have occurred at Johnson State Prison ("JSP") in Wrightsville, Georgia. For the reasons set forth below, the Court **REPORTS** and **RECOMMENDS** Defendants' motion for summary judgment be **GRANTED**, (doc. no. 75), Plaintiff's motion for summary judgment, trial related motions, and motion for appointment of counsel be **DENIED**, (doc. nos. 81-85, 88), a final judgment be **ENTERED** in favor of Defendants, and this civil action be **CLOSED**.

---

[1]The Court **DIRECTS** the **CLERK** to update Defendants' names on the docket in accordance with the above-caption, which is consistent with the answers. (Doc. no. 48, p. 1; doc. no. 68, p. 1.)

## I.      PROCEDURAL BACKGROUND

Plaintiff originally named the following Defendants: (1) Shawn Emmons, Warden at JSP, (2) Constance Pullins, Nurse; (3) Jason Hurst, Cert. Officer at JSP; (4) Lakeisha Smith, Cert. Officer at JSP; and (5) Larry Timmons, Cert. Officer at JSP.  (Doc. no. 9, pp. 1-3.)  On August 18, 2018, United States District Judge Dudley H. Bowen, Jr., dismissed Defendant Emmons after screening and allowed Plaintiff to proceed against the remaining Defendants based on claims of deliberate indifference to a serious medical need.  (Doc. nos. 11, 13.)

On May 5, 2020, Defendants filed a motion for summary judgment, and on June 1, 2020, Plaintiff filed his own motion for summary judgment, which in substance is a summary judgment response brief.  (Doc. nos. 75, 85.)  Plaintiff filed numerous other trial related motions and a motion for appointment of counsel.  (Doc. nos. 81-85, 88.)  Defendants submitted with their motion for summary judgment a Statement of Material Facts pursuant to Loc. R. 56.1.  (Doc. no. 75-2.)  Although Plaintiff did not file a responsive statement of facts, he submitted exhibits and testified at a deposition.

The Court deems admitted all portions of Defendants' Statement of Material Facts that have evidentiary support in the record and are not properly opposed by Plaintiff.  See Loc. R. 56.1; Fed. R. Civ. P. 56(e); see also Williams v. Slack, 438 F. App'x 848, 849-50 (11th Cir. 2011) (finding no error in deeming defendants' material facts admitted where *pro se* prisoner failed to respond with specific citations to evidence and otherwise failed to state valid objections); Scoggins v. Arrow Trucking Co., 92 F. Supp. 2d 1372, 1373 n.1 (S.D. Ga. 2000) (deeming admitted all unopposed fact statements supported by evidentiary materials of record).  Federal Rule of Civil Procedure 56 requires a party disputing a fact to cite "to particular parts of materials in the record," and an affidavit or declaration used to oppose a summary

2

judgment motion "must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." Fed. R. Civ. P. 56(c)(1) & (4).  The Court will review the entire evidentiary record, including Plaintiff's sworn deposition, "to determine if there is, indeed, no genuine issue of material fact." Mann v. Taster Intern., Inc., 588 F. 3d 1291, 1303 (11th Cir. 2009).

Plaintiff filed five unsworn statements that do not satisfy 28 U.S.C. § 1746 and cannot be considered at summary judgment.  Dudley v. City of Monroeville, 446 F. App'x 204, 207 (11th Cir. 2011) (*per curiam*) (citing Carr v. Tatangelo, 338 F.3d 1259, 1273 n.27 (11th Cir. 2003)).  Additionally, none of these statements have any bearing on the summary judgment issues addressed below.

## II.   FACTS

Plaintiff alleges two separate but related series of events, the first involving Defendant Pullins' alleged refusal to administer breathing treatments and the second involving the alleged deprivation of inhalers and an extension cord for his CPAP machine by Defendants Hurst, Timmons, and Smith (collectively "CERT Defendants").

### A.   Breathing Treatment Claim against Nurse Pullins

On April 28, 2016, Plaintiff reported to Nurse Practitioner ("NP") Pamela Lindsey that he stopped taking his asthma medications for seven days while fasting for Passover and suffered an asthma attack on April 19, 2016.  (Pullins Decl., doc. no. 75-4, pp.  1, 9; Pl.'s Dep., doc. no. 75-3, p. 90. [2])  NP Lindsey gave Plaintiff Claritin and instructed him to continue taking

---

[2]Because Plaintiff's deposition was filed in Minu-Script, the Court cites to the relevant deposition page number, not the page number assigned by the Court's docketing system.

Qvar, a daily asthma medication, and Xopenex, a rescue inhaler.  (Pullins Decl., pp. 1, 9, 13, 15.)  On the same day, a physician ordered Albuterol & Atrovent nebulizer treatments twice a day for the period of April 29 to May 5, 2016.  (Id. at 2, 17; Pl.'s Dep., p. 90.)  Nebulizers deliver bronchodilators, such as Albuterol & Atrovent, to relax muscles in the airways and increase airflow to the lungs.  (Pullins Decl., p. 4.)  While the above facts are undisputed, there are many factual disagreements concerning Plaintiff's breathing treatments thereafter.

### 1. Plaintiff's Version of Events

Defendant Pullins denied Plaintiff prescribed nebulizer treatments on April 29, May 2, and May 3 by failing to call Plaintiff to the medical unit from his dormitory.  (Pl.'s Dep., pp. 89-91.)   On May 11, Nurse Sutton examined Plaintiff, found wheezing, administered a nebulizer treatment, and conferred with a physician who ordered continued breathing treatments.  (Id. at 91.)  On May 12, Plaintiff received another breathing treatment.  (Id.)  On May 13, Plaintiff complained to Officer Byrd of breathing difficulties and requested permission to visit the medical unit for a nebulizer treatment.  (Id. at 92.)  Officer Byrd refused because the medical unit had not requested Plaintiff, which Plaintiff believes was Nurse Pullins' responsibility.  (Id.)  Plaintiff also did not receive breathing treatments from May 14 through May 18 because Defendant Pullins failed to call the dorm unit to request him.  (Id.)  On May 19, 2016, Plaintiff received a nebulizer treatment from Nurse Scarborough.  (Id. at 92-93.)

On May 20, Nurse Hall administered a nebulizer treatment, told Plaintiff she would speak with Defendant Pullins about her alleged failure to call for him, and stated she would provide Plaintiff with an Offender Movement Schedule  ("OMS") "so that [Plaintiff] would not have issues getting to medical for any scheduled breathing treatment."   (Id. at 93.)  On

May 21 and 22, Plaintiff did not receive a breathing treatment and blames Defendant Pullins for not calling his unit to request him.  (Id. at 94.)  On May 23, Defendant Pullins examined Plaintiff, and he believes she falsified her findings regarding his breathing so that his treatments would be discontinued, in retaliation for Plaintiff's numerous grievances and a dispute between them concerning Plaintiff's request for orthopedic shoes.  (Id. at 94, 98-99.) In support of his belief, Plaintiff points out that Nurses Sutton and Hall, respectively, evaluated Plaintiff and determined he needed continued breathing treatments on May 11 and 20.  (Id. at 94-95.)

With respect to protocol for inmate visits to the medical unit for breathing treatments and other scheduled treatments, Plaintiff testified "[i]t is standard procedure for medical when they're ready for individuals or inmates to come to medical for whatever purpose their treatment might [be]; they'll notify security and security will notify the entire compound that it's time for treatment."  (Id. at 92.)  Plaintiff testified Defendant Pullins violated this standard procedure by failing to call him to the medical unit for his breathing treatments.  (Id.)

When asked for a response to Defendant Pullins' defense that Plaintiff's breathing treatments were ordered on a "PRN" or "as needed" basis on May 11, 2016, which placed the obligation on Plaintiff to visit the medical unit if he was having breathing issues, Plaintiff gave the following answer:

> Actually, the order was for me to have breathing treatments for a period of time.  That's what the order was for, for a period of time.  As as you see, . . . when I received the OMS so that I could come up at that scheduled time for my breathing treatment.  That's why the OMS was generated so that I wouldn't have an issue or couldn't no officer say, well, look, you don't have a treatment if you don't have that OMS, then it is the responsibility of the nurse to call for you for that particular treatment.

> She did not do that.  On numerous occasions, she did not do that.  She should have because it was an order for me to have these breathing treatments until I didn't need them anymore.  And then the only way that you could assess if I needed them is to call me up there and see me.  You can't assess me if I'm not in medical and I'm in the dorm.  You don't know if I need a breathing treatment or not.  It is your job and your duty as a nurse to call me up there to assess my breathing because I've been given an order of treatment for nebulizer.

(Id. at 96-97.)

Plaintiff later explained that an OMS allows an inmate to "come at a certain time daily for [prescribed] treatment," and that without an OMS a nurse must "call you to medical for that particular treatment until you are given an OMS . . . ."  (Id. at 102-103.)  Guards will not call the medical unit on behalf of an inmate unless there is a medical emergency, which means for non-emergencies an inmate cannot gain permission to visit the medical unit unless he or she has an OMS or a nurse calls the unit to request the inmate for treatment.  (Id. at 108-109.)

### 2.  Defendant Pullins' Version of Events

By declaration, Defendant Pullins avers that, when the physician entered the order on April 28, 2016 for Plaintiff to receive two breathing treatments twice a day for seven days, a medical unit secretary was responsible for entering the order into Plaintiff's OMS, and Plaintiff's counselor was responsible for printing the OMS and giving it to Plaintiff.  (Pullins Decl. ¶ 5.)  Plaintiff was responsible for gaining permission to visit the medical unit for his breathing treatments by either showing the OMS to his unit officers or showing it to medical personnel during pill call.  (Id. ¶ 6.)

In May 2016, Defendant Pullins performed pill calls with another medical worker during evenings and weekends, and approximately once monthly she would perform a morning pill call.  (Id.)  When conducting pill calls, Defendant Pullins and her colleague worked from a list of inmate names and pill medications to be administered.  (Id.)  The pill call list did not

include information concerning nebulizer treatments to be administered in the medical unit.

(Id.)  Nurse Pullin avers,

> Inmate Ludy could have informed us (or any other pill call provider) at any time he had a scheduled breathing treatment and it would have been arranged.  I never would have refused an inmate a visit to the medical unit for a breathing treatment if it were listed on his OMS, or, more importantly, if he were in obvious respiratory distress (or even complaining of experiencing respiratory issues) (OMS or not).

(Id.)

Registered Nurse Kimberly Smith examined Plaintiff and administered nebulizer treatments on May 2,  3, and 4.  (Id. ¶ 7.)  Defendant Pullins does not know why Plaintiff did not receive nebulizer treatments on April 29, April 30, May 1, and May 5, but "it was inmate Ludy's responsibility to bring his OMS profile or his respiratory needs to the attention of a medical or non-medical prison official."  (Id.)

On May 11, 2016, Plaintiff had a sick call appointment with Nurse Sutton.  (Id. ¶ 8.) Plaintiff complained of wheezing, a tight chest, and yellow sputum.  (Id. & Ex. 7 to Pullins Decl.)  Plaintiff's oxygen saturation was determined to be 98% and wheezing was detected. (Ex. 7 to Pullins Decl.)  Plaintiff received a nebulizer treatment and was directed to continue taking his prescribed Qvar treatments and to use his Xopenex rescue inhaler as needed.  (Id. & Ex. 7.)  Plaintiff was prescribed daily nebulizer treatments for the next one or two weeks on a "PRN" or "as needed" basis.  (Pullins Decl. ¶ 9.)  PRN, or "as needed" status, is a universally recognized medical term meaning it is the patient's responsibility to follow up as needed.  (Id. ¶ 8.)  Because an OMS includes reference to PRN status, Plaintiff could have shown his OMS to unit officers to gain permission for visiting the medical unit to obtain a breathing treatment. (Id.)

On May 23, 2016, Plaintiff arrived at JSP's medical department for a sick call visit and was examined by Defendant Pullins.  (Id. ¶ 10 &  Ex. 9 to Pullins Decl.)  As verified by the medical record, Defendant Pullins determined Plaintiff's oxygen saturation level was at 100% and that his peak flow readings were "very good."  (Pullins Decl. ¶ 10 & Ex. 9.)  A peak flow meter ("PFM") is a device used to measure how well a patient's asthma is under control.  (Pullins Decl. ¶ 10.)  The device measures air flowing out of the lungs, called peak expiratory flow rate ("PEFR"), as a patient forcefully blows into the device.  (Id.)  Plaintiff's examination results were above average, he was not using his accessory muscles to breathe, and Plaintiff did not require a breathing treatment.  (Id.)  Defendant Pullins informed Physician's Assistant ("PA") Annie Bodi of Plaintiff's examination results, and PA Bodi determined Plaintiff did not meet the parameters for a nebulizer treatment that day.  (Id. & Ex. 9.)  PA Bodi's resulting medical order provided that Plaintiff was only to be administered a nebulizer treatment if his oxygen saturation level registered at 95% or less.  (Pullins Decl. ¶ 11.)

On June 2, 2016, Plaintiff refused a pre-scheduled appointment with Medical Director Seward.  (Id. ¶ 12 & Ex. 11 to Pullins Decl.)  Plaintiff signed a form acknowledging his refusal of treatment against advice.  (Pullins Decl. ¶ 12 & Ex. 11)  On the form, Plaintiff wrote he was refusing treatment because he believed the medical department had endangered his life by discontinuing his profile for treatment.  (Ex. 11 to Pullins Decl.)

Defendant Pullins concludes her declaration by denying any act or omission on her part for the purpose of delaying or denying Plaintiff breathing treatments.  She avers "[t]he only way I would have known at the time if inmate Ludy needed a nebulizer treatment . . . is if he had made a sick call request and/or visit to the medical unit on a day I was there—which the medical records show he did not do."  (Pullins Decl. ¶¶ 14-15.)  She denies knowledge of

Plaintiff needing breathing treatments on any day he did not receive treatment, and she avers Plaintiff never told her that unit officers denied him permission to visit the medical unit for breathing treatments.  (Id.)

### B.    CPAP Machine and Inhaler Claim

On June 28, 2016, the CERT Defendants, Hurst, Smith, and Timmons, accused Plaintiff of possessing a cellphone and transferred him to the J-1 security unit.  (Pl.'s Dep., pp. 5, 12-23, 29.)  Defendants Smith and Timmons escorted Plaintiff to J-1 security unit's shower area while Defendant Hurst packed up Plaintiff's property from his old cell.  (Id. at 31-33.)  Defendant Hurst joined Plaintiff and Defendants Smith and Timmons in the shower area with Plaintiff's property and conducted an inventory of Plaintiff's belongings.  (Id. at 33-35.)  Plaintiff requested his inhaler because heat in the shower area triggered breathing trouble, and Plaintiff believed he was suffering a "light asthma attack."  (Id. at 35.)

Sergeant Hurst explained to Plaintiff he saw no inhalers in the old cell when collecting Plaintiff's belongings.  (Id. at 36.)  Plaintiff testified he stored all three inhalers in a "little space" between his mattress and the cell wall, and despite this location, Plaintiff testified he did not "see how [Defendant Hurst] missed the inhalers . . . ."  (Id. at 37.)  When Plaintiff asked Defendants to return to his old cell immediately and conduct a second sweep to look for the items, the officers refused.  (Id. at 36-37.)  On July 4, 2016, Plaintiff reported his lack of inhalers to the medical unit and complained he "was having a little bit of breathing difficulty." (Id. at 47.)  On that same date, a nurse brought him a replacement inhaler.  (Id.)

Because Plaintiff's new cell in the J-1 security unit had no electrical outlets, and in fact "[t]here's no electrical outlets in J-1 security and J-2 security at all," Plaintiff asked Defendants to bring him an extension cord so that he could use his CPAP machine, but they refused.  (Id.

at 42-43.)  Plaintiff wanted to run the cord outside his cell to outlets in the hallway used to run

floor buffers.  (Id. at 44.)  Plaintiff followed up immediately with officers in the J-1 security

unit about his request for an extension cord, who in turn notified the unit manager and "did try

to help as much as they possibly could . . . ."  (Id. at 43.)  Despite these efforts, Plaintiff found

no solution and could not use his CPAP again until July 6, 2019, when he was moved to a

different cell and provided with an extension cord.  (Id. at 46-47; see also doc. no. 75-5, p. 90;

doc. no. 85-12; doc. no. 85-15.)  Between June 28, 2016 and July 5, 2016, Plaintiff repeatedly

notified non-party prison personnel of his inability to use the CPAP machine, but Plaintiff

never requested a visit to the medical unit.  (Pl.'s Dep., pp.38-52.)

**C.     Plaintiff's Alleged Injuries**

Plaintiff concedes that, prior to the acts and omissions he alleges against Defendants,

his asthma and breathing problems were "very severe."  (Id. at 101.)  On April 28, he was

"having difficulty breathing and [his] wheezing was very severe."  (Id.)  With respect to

damages arising from being unable to use inhalers and his CPAP from June 28 to July 6,

Plaintiff alleges he experienced difficulty breathing in the shower on June 28.  During the

seven-day period of June 28 to July 6 when Plaintiff was deprived of using his inhalers and

CPAP, he did not experience any asthma attacks.  (Id. at 48.)  Nor did he request or receive

any emergency medical treatment during this period.  (Id. at 64.)  Plaintiff claims he did

experience the following:  (1) breathing difficultness caused by the heat in the J-1 security unit

and his intolerance for heat; (2) "irregular heart cardio palpitations" because he has an "atrial

flutter"; and (3) difficulty sleeping without a CPAP machine.  (Id. at 48, 63-72.)

Plaintiff states his injury from the lack of breathing treatments is exacerbation of his

breathing difficulties.  (Id. at 102.)  He further alleges that, had he received the breathing

treatments he missed because of Defendant Pullins, "perhaps that time period would have helped cure a lot of my continued difficulties in breathing." (Id.)  Plaintiff further claims that, as a result of Defendant's acts and omissions, he has "needed breathing treatments and steroid shots as related to . . . continual lung issues now as well as a nodule in [his] lung." (Id. at 64-65.)  With respect to the lung nodule, medical staff discovered it after the events at issue here, and Plaintiff believes Defendants' acts and omissions "could possibly be" the cause of the nodule.  (Id. at 65.)

On July 16, 2016, nearly two months after the last allegation against Defendant Pullins and ten days after Plaintiff resumed using inhalers and a CPAP machine, Plaintiff experienced difficulty breathing and irregular heart palpitations, which Plaintiff believes to have been triggered by the heat of J-1 security unit.  (Id. at 104-05.)  Plaintiff informed an officer and requested emergency medical assistance.  (Id.)  The medical staff determined Plaintiff needed to go to the hospital.  (Id.)  Plaintiff's treating physician at Fairview Park Hospital could not determine a specific cause for Plaintiff's chest pains.  (Doc. no. 85-25.)

## III.   PLAINTIFF'S ANCILLARY MOTIONS SHOULD BE DENIED

Plaintiff suggests in his response brief that he was unable to obtain daily logs of the H-1 dormitory unit at JSP because Defendants disregarded Plaintiff's request for production of documents, and Plaintiff attaches a copy of the request to his response brief.  (Doc. no. 85, ¶ 1; Doc. no. 85-2.)  The Court liberally construes this argument as a motion to compel and a Rule 56(d) motion to defer consideration of the summary judgment motion to allow additional time for discovery.  The motion as construed should be denied.

The document request is undated and seeks information unrelated to this case concerning, for example, tobacco use at JSP.  Defendants contend they never received this

request, and Plaintiff never mentioned it in any good faith attempt to resolve this discovery dispute, as required by both Rule 37 and Local Rule 26.5. Plaintiff has not submitted proof of serving the request on Defendants, does not contend he attempted a good faith resolution of the dispute, and he did not move to compel production before expiration of the June 1, 2020, deadline for filing all pretrial motions. Furthermore, the only discovery issue Plaintiff raised with this Court prior to discovery closing on March 30, 2020, was a request to extend discovery so Plaintiff could obtain a copy of his deposition. (See doc. no. 74.)

Plaintiff has not shown good cause for his failure to timely pursue this alleged discovery dispute, and the Court will not revisit the expired deadlines. See Watkins v. Regions Mortg. Inc., 555 F. App'x 922, 924 (11th Cir. 2014) (per curiam) (affirming denial of requests for discovery submitted after expiration of scheduling order deadlines); Sullivan's Admin. Manager's II, LLC v. Guarantee Ins. Co., Case No. CV 412-212, 2013 WL 12158619, at *1 (S.D. Ga. Apr. 25, 2013) (denying implicit motion to amend scheduling order occasioned by submission of untimely motion to compel); see also Fed. R. Civ. P. 16(b) (requiring courts to set deadlines for discovery and allowing modification only for good cause). That Plaintiff chose not to pursue potential discovery issues during the designated discovery period does not excuse him from compliance with the rules governing discovery and summary judgment. See Moon v. Newsome, 863 F.2d 835, 837 (11th Cir. 1989) ("[O]nce a pro se IFP litigant is in court, he is subject to the relevant law and rules of court, including the Federal Rules of Civil Procedure."); see also Albra v. Advan, Inc., 490 F.3d 826, 829 (11th Cir. 2007) ("[A]lthough we are to give liberal construction to the pleadings of pro se litigants, 'we nevertheless have required them to conform to procedural rules.'"). For all of these reasons, the motion as construed should be denied.

Plaintiff also filed multiple trial-related motions ranging from a request for witness subpoenas to a motion in limine prohibiting the use of Plaintiff's criminal record.  Because these motions are premature and summary judgment should be granted in Defendants' favor on all claims as explained below, these motions should be denied.  (Doc. nos. 81-83, 88.)

Plaintiff also filed a motion for appointment of counsel.  (Doc. no. 84.)  As a general rule, there is no entitlement to appointed counsel in a civil rights case such as this one.  Dean v. Barber, 951 F.2d 1210, 1216 (11th Cir. 1992).  Rather, the appointment of counsel is a privilege justified only by exceptional circumstances. Id.; see also Smith v. Fla. Dep't of Corr., 713 F.3d 1059, 1065 (11th Cir. 2013) (finding exceptional circumstances justified appointment of counsel where suspect conduct of prison officials hindered prisoner plaintiff's ability to present essential merits of case and, additionally, where such appointment would alleviate security concerns and help sharpen issues).

Here, Plaintiff fails to show exceptional circumstances exist to justify the appointment of counsel.  Steele v. Shah, 87 F.3d 1266, 1271 (11th Cir. 1996).  Plaintiff has not shown that his status as a layman prevents him from "presenting the essential merits of his . . . position," which is the key consideration in determining whether the appointment of counsel is justified. Kilgo v. Ricks, 983 F.2d 189, 193 (11th Cir. 1993).  Indeed, Plaintiff has shown an ability to communicate with the Court and present the essential merits of his position, as indicated in his motions and response to Defendants' motion for summary judgment.  Accordingly, Plaintiff motion for appointment of counsel should be denied.  (Doc. no. 84.)

## IV.    DEFENDANTS ARE ENTITLED TO SUMMARY JUDGMENT

Summary judgment is appropriate only if "there is no genuine dispute as to any material fact and the movant is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(a).  "The

13

mere existence of some factual dispute will not defeat summary judgment unless that factual dispute is material to an issue affecting the outcome of the case." McCormick v. City of Fort Lauderdale, 333 F.3d 1234, 1243 (11th Cir. 2003) (citation omitted).

If the burden of proof at trial rests with the movant, to prevail at the summary judgment stage, the movant must show that, "on all the essential elements of its case . . . , no reasonable jury could find for the nonmoving party." United States v. Four Parcels of Real Prop., 941 F.2d 1428, 1438 (11th Cir. 1991) (*en banc*).  On the other hand, if the non-moving party has the burden of proof at trial, the movant may prevail at the summary judgment stage either by negating an essential element of the non-moving party's claim or by pointing to specific portions of the record that demonstrate the non-moving party's inability to meet its burden of proof at trial. Clark v. Coats & Clark, Inc., 929 F.2d 604, 606-08 (11th Cir. 1991) (explaining Adickes v. S.H. Kress & Co., 398 U.S. 144 (1970) and Celotex Corp. v. Catrett, 477 U.S. 317 (1986)).

If the moving party carries the initial burden, then the burden shifts to the non-moving party "to demonstrate that there is indeed a material issue of fact that precludes summary judgment." Id. at 608.  The non-moving party cannot carry its burden by relying on the pleadings or by repeating conclusory allegations contained in the complaint. Morris v. Ross, 663 F.2d 1032, 1034 (11th Cir. 1981).  Rather, the non-moving party must respond either by affidavits or as otherwise provided in Federal Rule Civil Procedure 56.  "The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986) (quoting Adickes, 398 U.S. at 158-59).  A genuine dispute as to a material fact is said to exist "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Id. at 248.

14

To prevail on a claim for deliberate indifference to a serious medical need, Plaintiff must prove (1) he had a serious medical need – the objective component, (2) a defendant acted with deliberate indifference to that need – the subjective component, and (3) his injury was caused by a defendant's wrongful conduct.  Goebert v. Lee Cnty., 510 F.3d 1312, 1326 (11th Cir. 2007); see also Thomas v. Bryant, 614 F.3d 1288, 1317 n.29 (11th Cir. 2010).  Defendants contend Plaintiff cannot satisfy any of these elements.  The Court finds that, assuming Plaintiff's asthma is a serious medical need, no reasonable juror could find Defendants were deliberately indifferent to this need or Plaintiff suffered a causally related injury.

### A.    No Reasonable Juror Could Find Deliberate Indifference

To satisfy the subjective component that Defendants were deliberately indifferent, Plaintiff must present evidence that Defendants:  (1) were subjectively aware of a serious risk to Plaintiff's health, and (2) that Defendants disregarded that risk by (3) following a course of action which constituted "more than mere negligence."  Melton v. Abston, 841 F.3d 1207, 1223 (11th Cir. 2016) (per curiam).  "A prisoner must show the defendant prison officials acted with a sufficiently culpable state of mind."  Chandler v. Crosby, 379 F.3d 1278, 1290 (11th Cir. 2004) (citations omitted).  Thus, mere allegations of negligence or malpractice do not amount to deliberate indifference.  Campbell v. Sikes, 169 F.3d 1353, 1363-72 (11th Cir. 1999); Harris v. Thigpen, 941 F.2d 1495, 1505 (11th Cir. 1991); see also Palazon v. Sec'y for Dep't of Corr., 361 F. App'x 88, 89 (11th Cir. 2010) (per curiam) (requiring more than "merely accidental inadequacy, negligence in diagnosis or treatment, or even medical malpractice actionable under state law" to establish deliberate indifference claim).

The facts alleged by Plaintiff during his deposition, when coupled with facts proffered by the defense that Plaintiff has not disputed, establish beyond peradventure Defendants were

not deliberately indifferent.  With respect to Plaintiff's loss of use of his inhalers and CPAP machine from June 28 to July 5, Plaintiff concedes Defendant Hurst went to his old cell and packed up Plaintiff's belongings for transfer to the J-1 security unit.  (Pl.'s Dep., pp. 31-33.) The only items Plaintiff alleges Defendant Hurst missed were the three inhalers Plaintiff stored in a small area between his mattress and the cell wall.  (Id. at 37.)  There is no evidence Defendant Hurst intentionally left the inhalers in Plaintiff's old cell.  Instead, at most, he simply missed them when conducting a good faith search of the cell.  Such conduct amounts to, at best, simple negligence, and no reasonable juror could find deliberate indifference.

Plaintiff accuses the CERT Defendants of refusing his demand that they return immediately to his cell and conduct a second search for his inhalers because he was "maybe" suffering a "light asthma attack," brought on by the heat in the shower area of the J-1 security unit.  (Id. at 35.)  Plaintiff testified that, in response to the demand, Defendant Hurst explained he had already conducted a thorough search and found no inhalers.  (Id. at 36.)  There is no evidence suggesting Plaintiff ever told Defendant Hurst of the inhalers' location between the mattress and the cell wall.  Nor has Plaintiff offered anything more than conjecture about any lasting injury from his light asthma attack during the move from his old cell. No reasonable juror could find deliberate indifference under these circumstances.

Plaintiff could survive summary judgment if, for example, Defendant Hurst had seen the inhalers and refused to bring them.  Where, as here, a guard conducts a thorough search and delivers to an inmate all property he can find, with the only missing items located between a mattress and the cell wall, it is not deliberately indifferent to refuse an inmate's demand for an immediate follow-up search on the basis that the first search was thorough and the inhalers were not there.  There was certainly no medical emergency, based on Plaintiff's concession he

16

was, at most, "maybe" suffering a "light asthma attack." (Id. at 35.) While this may constitute negligence, no reasonable juror could find deliberate indifference.

Furthermore, Plaintiff's inability to receive his inhalers immediately upon his transfer cannot be the proximate cause of Plaintiff spending seven days without his inhalers. Indeed, as Plaintiff concedes, when he finally reported the loss of his inhalers and "a little bit of breathing difficulty" to the medical unit on July 2, the medical unit responded and provided him with a replacement inhaler on July 4. (Pl.'s Dep., pp. 47-48.)

Similar reasons dictate the same outcome with respect to Plaintiff's CPAP machine. The CERT Defendants transported the CPAP machine to the J-1 security unit from Plaintiff's old cell. It was not their fault cells in J-1 have no electrical outlets. Refusing Plaintiff's demands to find him an extension cord immediately might constitute negligence but not deliberate indifference. No reasonable juror could disagree. Furthermore, Plaintiff immediately complained about his inability to plug in the CPAP machine to officers assigned to the J-1 security unit, and Plaintiff testified the J-1 security officers notified the unit manager and did as much as they could to try and accommodate his need, to no avail. (Id. at 43.) According to Plaintiff's own testimony, therefore, the responsibility for remedying the electrical problem obviously lay with the officers and manager assigned to J-1, and not with the CERT Defendants, who merely transported Plaintiff and his belongings to the new unit. No reasonable juror could find otherwise.

This recurring pattern dictates the same outcome with respect to the claim against Defendant Pullins. Plaintiff does not allege he notified Defendant Pullins of his need for a breathing treatment and she refused to help, such that no reasonable juror could find Defendant Pullins had subjective knowledge of his need and disregarded it. Plaintiff alleges it was

Defendant Pullins' obligation to call his unit and request permission for Plaintiff to visit the medical unit for his treatments, citing in support his understanding of a "standard procedure" whereby medical personnel notify security officers, who in turn "notify the entire compound that it's time for treatment." (Id. at 92.) Assuming such a custom or policy is practiced at JSP, Plaintiff does not explain the reason he believes this was specifically Defendant Pullins' responsibility, and he submits no evidence supporting his belief.

In fact, he agrees with Defendant Pullins an OMS would have permitted him daily access to the medical unit for his breathing treatments, thereby obviating the need for any call by medical personnel to Plaintiff's unit. (Id. at 97.) It is undisputed Plaintiff should have received an OMS from the outset of the original April 28 order for breathing treatments to start on April 29, 2016. (Pullins Decl. ¶ 5.) It is also undisputed the responsibility for issuance of the OMS lay not with Defendant Pullins, but instead with secretaries in the medical unit and Plaintiff's counselor. (Id.) For all of these reasons, no reasonable juror could find Plaintiff's inability to receive breathing treatments on certain dates was proximately caused by any act or omission attributable to Defendant Pullins, and further there is no factual basis to support a finding of deliberate indifference by her.

Nor could any reasonable juror find Defendant Pullins falsified the results of her examination on May 23, 2016. Plaintiff offers no evidence in support of this allegation aside form conjecture. Defendant Pullins avers, and the medical records confirm, that Plaintiff's oxygen saturation was 100% and his peak flow ratings were very good. (Id. ¶ 10 & Ex. 9.) Furthermore, even if Defendant Pullins had falsified these evaluation findings, Plaintiff can claim no resulting harm because, at most, the findings prompted PA Bodi to issue an order declaring Plaintiff to be eligible for breathing treatments when his oxygen saturation levels fell

below 96%, and it is undisputed this order is consistent with the standard of care.  (Pullins
Decl. ¶ 11.)  Even if this order were inconsistent with the standard of care, it was issued by PA
Bodi, not Defendant Pullins, and would at most constitute medical malpractice, not deliberate
indifference.   Additionally, Plaintiff has presented no evidence suggesting this order
contravenes accepted medical practices or caused him to be deprived of any breathing
treatments.   Moreover, Plaintiff thwarted a prime opportunity to set the record straight
concerning the true state of his respiratory health and mount a challenge to PA Bodi's order
when he canceled a June 2 appointment with Dr. Seward, the medical director.  (Id. ¶ 12.)

A mere difference of opinion between an inmate and prison medical officials over a
diagnosis or course of treatment does not support a claim of deliberate indifference.  See Smith
v. Fla. Dep't of Corr., 375 F. App'x 905, 910 (11th Cir. 2010) (per curiam).  Furthermore, the
Court should not second-guess medical judgments.  Wallace v. Sheriff, 518 F. App'x 621, 622-
23 (11th Cir. 2013) (per curiam); Smith, 375 F. App'x at 910 ("[W]hether governmental actors
should have employed additional diagnostic techniques or forms of treatment is a classic
example of a matter for medical judgment and therefore not an appropriate basis for grounding
liability under the Eighth Amendment.").

**B.      No Reasonable Juror Could Find Defendants' Alleged Acts and Omissions
         Exacerbated Plaintiff's Asthma**

Because he alleges deliberate indifference based on delay in medical treatment,
Plaintiff  "must place verifying medical evidence in the record to establish the detrimental
effect of delay in medical treatment to succeed."  Hill v. Dekalb Reg'l Youth Det. Ctr., 40 F.3d
1176, 1187 (11th Cir. 1994)), abrogated in part on other grounds by Hope v. Pelzer, 536 U.S.
730, 739 n.9 (2002); Owen v. Corizon Health Inc., 703 F. App'x 844, 847 (11th Cir. 2017) (per

19

*curiam*).  "Unsupported, conclusory allegations that a plaintiff suffered a constitutionally cognizant injury are insufficient to withstand a motion for summary judgment." <u>Howard v. Memnon</u>, 572 F. App'x 692, 695 (11th Cir. 2014) (*per curiam*) (citing <u>Bennett v. Parker</u>, 898 F.2d 1530, 1532-34 (11th Cir. 1990)).  No such medical evidence exists in the record, and the undisputed facts provide no basis for a reasonable juror to find Plaintiff suffered any exacerbation of his asthma from the breathing treatments he missed or the temporary loss of use of his inhalers and CPAP machine.

As a baseline to determine whether exacerbation occurred, one must first consider Plaintiff's concession that, on April 28, the day before any act or omission by any Defendant, he was "having difficulty breathing and [his] wheezing was very severe."  (Pl.'s Dep., p. 101.) During the seven-day period of June 28 to July 6, when Plaintiff was deprived of using his inhalers and CPAP, he did not experience any severe asthma attacks.  (<u>Id.</u> at 48.)  He did not receive any emergency medical treatment during this period either.  (<u>Id.</u> at 64.)  There is also no medical evidence Plaintiff's condition worsened during the time period he missed breathing treatments in May 2016.

Indeed, the only asthma attack documented in Plaintiff's JSP medical records occurred on April 19, 2016, well before Defendant Pullins' alleged delay in treatment.  (Pullins Decl., pp. 3, 9.)  Additionally, the asthma attack was not reported by Plaintiff until nine days later during his visit to the medical unit on April 28, 2016.  <u>Id.</u>  Plaintiff argues he experienced an asthma attack on June 28, 2016, but he concedes the trigger was heat and has submitted no proof of injury from this attack.  (Pl.'s Dep., pp. 32, 35.)

Plaintiff claims he experienced the following as a result of the acts and omissions by all Defendants:  (1) breathing difficulties; (2) "irregular heart cardio palpitations" because he

has an "atrial flutter"; and (3) difficulty sleeping without a CPAP machine.  (Id. at 48, 63-72.)
Problematically, Plaintiff claims the heat in J-1 triggered his breathing difficulties and
palpitations, but he also claims Defendants' acts and omissions caused these same problems.
(Id.)  The medical record does not confirm his suspicions of exacerbation by Defendants'
conduct.  Plaintiff further alleges that, had he received the breathing treatments he missed
because of Defendant Pullins, "perhaps that time period would have helped cure a lot of my
continued difficulties in breathing." (Id. at 102.)  The medical record is devoid of any evidence
to support this conjecture.

Plaintiff further claims that, as a result of Defendants' acts and omissions, he has
"needed breathing treatments and steroid shots as related to . . . continual lung issues now as
well as a nodule in [his] lung."  (Id. at 64-65.)  Of course, it is undisputed Plaintiff's condition
was very severe before any of the events alleged by Plaintiff, and Plaintiff is adamant he
needed continual care throughout the entire relevant time period by way of daily access to
breathing treatments, inhalers, and a CPAP machine.  With respect to the lung nodule, medical
staff discovered it after the events at issue here, and Plaintiff believes Defendants' acts and
omissions "could possibly be" the cause of the nodule.  (Id. at 65.)  No evidence in the medical
record supports his belief.

Plaintiff also points to his July 16, 2016, trip to the emergency room, ten days after
Plaintiff obtained a replacement inhaler and resumed use of his CPAP.   Plaintiff experienced
difficulty breathing and irregular heart palpitations, which Plaintiff believes to have been
triggered by the heat of J-1 security unit.  (Id. at 104-05.)  Plaintiff has provided records for
his trip to the emergency room on July 16, 2016, but the records only indicate the trip was for
cardiac pains.  (Doc. no. 85-25, pp. 1-2.)  Plaintiff's treating physician at Fairview Park

Hospital could not determine a cause.  (Id. at 1.)  Certainly, the hospital records from this visit do not suggest Plaintiff's chest pain was attributable to missed breathing treatments, or the temporary loss of use of his inhalers and CPAP machine.

No reasonable juror considering these facts could find Defendants' alleged acts and omissions exacerbated Plaintiff's asthma.  Instead, the undisputed facts show (1) his asthma was very severe before the first allegation against any Defendant; (2) there was no significant deterioration of his asthma during the period of time the acts and omissions allegedly occurred; (3) Plaintiff himself attributes much of his breathing difficulties during the relevant time period to the heat in the J-1 unit; and (4) the most concerning event, Plaintiff's visit to the emergency room on July 16, was for treatment of chest pain, not breathing problems, and it occurred ten days after the last relevant events, despite Plaintiff having full and complete access to breathing treatments, inhalers and CPAP machine.

## V.      CONCLUSION

For the reasons set forth above, the Court **REPORTS** and **RECCOMMENDS** Defendants' motion for summary judgment be **GRANTED**, (doc. no. 75), Plaintiff's motion for summary judgment, trial related motions, and motion for appointment of counsel all be **DENIED**, (doc. nos. 81-85, 88), a final judgment be **ENTERED** in favor of Defendants, and this civil action be **CLOSED**.

SO REPORTED and RECOMMENDED this 19th day of August, 2020, at Augusta, Georgia.

BRIAN K. EPPS
UNITED STATES MAGISTRATE JUDGE
SOUTHERN DISTRICT OF GEORGIA